# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

STEPHEN R. DUDERSTADT,   :

   Plaintiff,     :
              Case No. 3:13cv00302
 vs.         :
             District Judge Walter Herbert Rice
CAROLYN W. COLVIN,    : Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,    :

   Defendant.     :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I. Introduction

Plaintiff Stephen R. Duderstadt brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff filed his applications for benefits on June 29, 2010, alleging that he has been disabled since February 25, 2010, as a result of lower back pain, pain in both knees, depression, and schizophrenia.  (*PageID##* 211-17, 218-23, 254).  When Plaintiff's initial applications and request for reconsideration were denied, he requested a *de novo* hearing before an administrative law judge ("ALJ").  After an evidentiary hearing held on

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

February 14, 2012, ALJ Amelia G. Lombardo denied Plaintiff's applications in a written decision dated June 7, 2012.  (*PageID## 54-68*).

The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration when the Appeals Council denied Plaintiff's request for further review.  (*PageID## 39-44*).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record (Doc. #6), and the record as a whole.

II.  **Background**

A.  **Plaintiff's Vocational Profile and Testimony**

Plaintiff was 49 years old on the alleged disability onset date, which defined him as a "younger individual" for purposes of resolving his DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[2]; *PageID# 260*.  Plaintiff has a high school education. *See* 20 C.F.R. § 404.1564(b)(4); *PageID# 255*.  Plaintiff has past relevant employment as a bailer operator, fork lift operator, and shipping clerk.  (*PageID## 67, 266*).

Plaintiff testified at the February 14, 2012, administrative hearing that he was 6' 3" and weighed 348 pounds.  (*PageID# 79*).  He lives in a two story house with his wife and stepson.  (*Id.*).  A friend brought him to the hearing.  (*Id.*).  He has a driver's license but does not own a car.  (*PageID# 80*).  Plaintiff had been most recently employed as a

---

[2]The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

shipping clerk.  (*Id.*).  Plaintiff testified he was fired from his shipping clerk job in February 2010, as a result of poor work quality and missing too many days. (*PageID#* 81).  The ALJ acknowledged that Plaintiff had a good work history.  When the ALJ asked, "why did you start doing bad work in 2010?" Plaintiff responded that his sister passed away and he began having anxiety and depression.  (*PageID#* 82).

At the time of the hearing, Plaintiff was taking medication prescribed by his psychiatrist, Dr. Chan, and acknowledged that the medication helps.  (*PageID#* 82).

Plaintiff next testified to having left shoulder and left knee pain.  (*PageID#* 83). He underwent seven surgeries on his knee.  (*Id.*).  He also takes Tylenol for low back pain. (*PageID#* 84).  Plaintiff rated his back pain at a level of 6 on a 0-10 visual analog scale. (*PageID#* 88).

Plaintiff estimated he could walk a block and a half at one time.  (*PageID#* 84). He also believed he could stand for 20 minutes and sit for 20 to 25 minutes at a time. (*PageID#* 85).  In addition, he estimated he could lift 20 pounds occasionally, but not frequently.  (*PageID##* 85, 89).  He can reach overhead and take an item off of a shelf above him.  (*PageID#* 89).

As to his activities of daily living, Plaintiff testified that he performs household chores such as laundry, vacuuming, and doing dishes.  He goes grocery shopping with his wife and still fishes.  (*PageID#* 85).  He socializes with his friends and extended family. (*PageID##* 85-86).  Plaintiff testified that on a typical day he gets up, takes medication,

watches television, and takes a "couple of naps," because, "I get real tired easy and sometimes I have anxiety attacks."  (*PageID#* 86).

Plaintiff testified that he experienced panic attacks 2 times a week that left him tired and in need of a 2 to 3 hour nap afterward.  (*PageID##* 86-87). He reported his anxiety attacks were triggered by social situations or stressful situations, such as driving or arguments.  (*PageID#* 93).

### B.  Vocational Expert Testimony

A vocational expert ("VE") classified Plaintiff's past employment as a bailer operator, performed at the heavy, skilled level; a forklift operator, performed at the medium, semi-skilled level; and a shipping clerk performed at the light, semi-skilled level.  (*PageID#* 95).  Based on Plaintiff's age, education, work experience, and residual functional capacity, the VE testified that Plaintiff could perform his past relevant work as a shipping clerk.  (*PageID#* 96).

### C.  Relevant Medical Opinions[3]

**Physical Impairments**

### 1.  Lori McFann, M.D.

Plaintiff began treatment with his primary care physician, Dr. McFann, in February

---

[3]The record contains additional evidence including records from Mental Health Services for Clark County, counselor Mark Schweikert, and Yiu Chung Chan, M.D.  (*PageID##* 678-704).  That evidence was not before the ALJ.  Rather, Plaintiff submitted it to the Appeals Council.  However, since the Appeals Council denied Plaintiff's request for review, that evidence is not a part of the record for purposes of substantial evidence review of the ALJ's decision.  *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted).  Review of the Commissioner's decision is limited to the record made before the ALJ.  *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007).

2007 for hypertension, anxiety, and left hip to foot pain and stiffness. Dr. McFann prescribed Buspar for Plaintiff's anxiety symptoms. (*PageID#* 428).

A letter from orthopedic surgeon John Dobson, M.D., to Dr. McFann dated June 18, 2007, reported Plaintiff underwent arthroscopy/partial meniscectomy in August 2005 and Dr. Dobson planned another arthroscopy/partial meniscectomy. (*PageID#* 471).

In October 2008, Dr. McFann prescribed Plaintiff Xanax for his anxiety symptoms. (*PageID#* 423).

Lumbar spine x-rays taken in October 2008 found no degenerative changes. (*PageID#* 449). Thoracic spine x-rays showed mild to moderate right-sided degenerative changes at T9-10. (*PageID#* 448). Cervical spine x-rays showed mild disc space narrowing at C5-6 and C6-7. (*PageID#* 447). Bilateral hip x-rays were normal. (*PageID##* 445-46).

A MRI taken in January 2009 of Plaintiff's cervical spine revealed minimal disc degenerative changes with no disc herniation or focal neural impingement. (*PageID#* 430).

On January 4, 2011, Dr. McFann completed a multiple impairment questionnaire on Plaintiff's behalf. (*PageID#* 571-78). Dr. McFann reported Plaintiff's diagnoses of history post CVA (cerebrovascular accident/stroke), gastritis with a history of gastro-intestinal bleed, fatty liver, anxiety disorder, COPD (chronic obstructive pulmonary disease), chronic headaches, chronic neck pain, non-alcoholic steatohepatitis, and carpal tunnel syndrome. (*PageID#* 571). Dr. McFann noted that Plaintiff

5

experienced pain in his lower back, hips and knees on a daily basis.  (*PageID##* 572-73).  She opined that physically, Plaintiff was capable of sitting for 4 hours in a workday and standing or walking for 4 hours.  (*PageID#* 573).  According to Dr. McFann, it was "medically recommended" that Plaintiff take a 45 to 90 minute break every 2 hours, and that he could not stand or walk continuously.  (*PageID##* 573-74, 576).  Dr. McFann also found that Plaintiff's emotional difficulties contributed to his overall functional limitations.  As a result of his depression, anxiety, and avoidance, Dr. McFann opined that Plaintiff was incapable of performing even low stress work.  (*PageID#* 576).  She further opined that Plaintiff was likely to be absent 2 to 3 days per month.  (*PageID#* 577).

On January 21, 2011, Dr. McFann prepared a narrative reporting that Plaintiff has been diagnosed with "multiple medical conditions that I truly and wholehearted[ly] believe preclude his ability to perform any job."  She reported that Plaintiff "has slowly but consistently worsened through the last two years."  Dr. McFann listed Plaintiff's medical conditions as: cerebral vascular disease with CVA in January 2009 resulting in facial paresthesia, left eye visual change, balance disturbance and tremor; recurrent migraines; peptic ulcer disease with GI bleed in 2009; chronic insomnia; bipolar disorder; anxiety disorder; anger disorder; obesity; fatty liver (NASH); osteoarthritis; and benign prostatic hypertrophy.  Dr. McFann opined that "[w]hen the combination of the above medical and psychiatric diseases combine, the effects impede physical labor due to excess pain and restricted mobility worsened by the emotional and social inflexibility and

6

inability to cope with any additional job or life stressors. I do not feel that [Plaintiff] could physically complete, nor psychologically withstand the pressures required of even a sedate job. I do not feel that these limitations are short term, nor do I anticipate resolution of any of his health problems." (*PageID##* 585-86).

### 2. <u>Rohn Kennington, M.D.</u>

Dr. Kennington examined Plaintiff on September 9, 2010, for the Ohio Bureau of Disability Determinations ("BDD"). (*PageID##* 556-63). Plaintiff reported that he suffers from mental illness; chronic spine pain, including his neck and lower back; a stroke in 1999; and coronary artery disease. (*PageID#* 558). On examination, Dr. Kennington found tenderness to palpation over a portion of the dorsal spine and over the left knee; moderate obesity; and some subjective sensory changes in the distal portion of the upper and lower extremities. There are no focal neurological findings found in terms of any obvious residuals from Plaintiff's stroke in 1999. His mental status is grossly within normal limits. (*PageID#* 560). A x-ray of Plaintiff's right knee showed no fractures, dislocations, degenerative changes, bone erosion, destruction and no joint effusion. (*PageID#* 556). Dr. Kennington diagnosed coronary artery disease, status post CVA in 1999 with no obvious residual signs or symptoms, chronic neck pain with cervical degenerative disc disease, chronic low back pain due to lumbar degenerative disc disease, depression, recent diagnosis of schizophrenia, bilateral carpal tunnel syndrome, fatty infiltration of the liver, and moderate obesity. (*Id.*). Dr. Kennington opined Plaintiff was capable of light lifting, carrying, pushing or pulling, but would require short periods

7

of no more than 30 minutes at a time of sitting, standing, or walking due to his knee problems.  (*PageID#* 561).

### 3. State Agency Evaluations

Gary Hinzman, M.D. reviewed the record on September 22, 2010, and concluded that Plaintiff had no severe physical impairment.  (*PageID#* 109).  Willa Caldwell, M.D. reviewed Plaintiff's file on December 7, 2010 and opined that Plaintiff was capable of lifting and carrying 20 pounds occasionally, and 10 pounds frequently; he could stand or walk up to 6 hours a day and sit up to 6 hours a day.  (*PageID##* 130-31).

**Mental Impairments**

### 1. Mercy Hospital Adult Care Unit at Mental Health Services for Clark County

Plaintiff was admitted and hospitalized for 5 days from June 4-9, 2010, due to responding to auditory/visual hallucinations, delusional thoughts, extreme agitation, and aggression.  (*PageID#* 591).  Mental status examination showed agitated activity, circumstantial speech, suspicious attitude, impaired memory, tangential thought process, loose associations, delusions, and paranoia.  (*PageID#* 594).  He was diagnosed with major depressive disorder, severe, with psychotic features; schizoaffective disorder, depressive type; and assigned a Global Assessment of Functioning ("GAF") score of 20.[4]

---

[4]"GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Comm'r of Soc. Sec.*, 61 Fed. Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34. Individuals with a GAF score of 20 are classified as having "some danger or hurting self or others OR

(*PageID#* 633). Plaintiff's severe depression was treated and he had no suicidal ideations at discharge. Upon discharge Plaintiff's assigned GAF score was 55-60.[5] (*PageID#* 633).

## 2. Mark Schweikert, PCC-S

Plaintiff met with a counselor, Mark Schweikert for an initial assessment on June 14, 2010. (*PageID##* 587-90). Plaintiff was referred for aftercare outpatient treatment of his depression from the Adult Care Unit. Plaintiff's mood was depressed with feelings of hopelessness, helplessness, and irritability; poor sleep; decreased appetite; lethargy; forgetfulness; and indecisiveness. (*PageID#* 587). Plaintiff reported he had been abused physically, sexually, and emotionally by his father before leaving his home at age 13. (*PageID#* 588). On mental status examination, Mr. Schweikert noted Plaintiff appeared older than his stated age of 49 years old. His attitude was positive and his behavior was controlled. Plaintiff's motor activity was within normal range. Plaintiff was oriented in all four spheres and memory was intact in all three time periods. Plaintiff's mood was depressed. Affect was congruent with mood. Plaintiff's thought processes were clear and he denied any delusions and/or hallucinations. Mr. Schweikert found Plaintiff was at low risk for self harm due to no current suicidal or homicidal ideations. Plaintiff appeared to have a good support system and was very motivated to do well in the future. Plaintiff was diagnosed with major depressive disorder, severe with psychotic features and assigned a

---

occasionally fails to maintain minimal personal hygiene OR gross impairment in communication." (*Id.*).

[5]A GAF score of 51-60 indicates that a person has "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

GAF score of 50.  (*PageID#* 590).  Mr. Schweikert recommended Plaintiff meet with a psychiatrist for medication management of his depression and individual outpatient counseling one time a week to learn coping mechanisms to improve his mood.  (*PageID#* 589).

Mr. Schweikert completed a questionnaire for the Ohio BDD on November 5, 2010.  Mr. Schweikert noted that Plaintiff suffers from major depression and experiences low energy, poor concentration, crying spells and feeling overwhelmed.  Mr. Schweikert noted that Plaintiff is not able to socialize, does not do hobbies as often due to lack of funds and feels uncomfortable in large crowds.  (*PageID##* 568-69).

On July 13, 2011, Mr. Schweikert completed an outpatient discharge summary wherein he noted that Plaintiff attended 10 sessions of therapy "with the main focus being on gaining coping skills to improve his mood.  Identified main problems causing his depression as being out of work.  [Plaintiff]'s mood had improved tremendously throughout treatment due to prescribed medications and practicing the tools he used to manage his depression."  Mr. Schweikert closed Plaintiff's case on November 19, 2010 because Plaintiff "missed a lot of appointments while in treatment."  Mr. Schweikert also noted that medications were prescribed while in treatment for his depression and Plaintiff had positive results with the medications prescribed by Dr. Chan.  Mr. Schweikert assigned Plaintiff a discharge GAF score of 55.  (*PageID#* 661).

### 3.    Yiu Chung Chan, M.D.

Plaintiff first saw psychiatrist, Dr. Chan, for medication management in June 2010.

(*PageID##* 632-33).  Plaintiff generally presented with a depressed mood, constricted affect, and limited insight and judgment.  (*PageID##* 477-80, 647-59).  Dr. Chan prescribed him Trazadone, and Celexa; he also took Ultram, an analgesic pain reliever. (*PageID#* 479).

On July 11, 2011, Dr. Chan completed an impairment questionnaire in which he opined that Plaintiff had marked limitations in sub-categories of the functional domains of understanding and memory, sustained concentration and persistence, social interactions, and adaptation.  (*PageID##* 622-24).  Dr. Chan also opined that Plaintiff was incapable of even low stress work because he was easily distressed, had poor concentration, and increased anxiety due to his mental impairments.  (*PageID#* 625).  Dr. Chan further opined that Plaintiff would likely miss more than 3 days of work per month. (*PageID#* 626).

On November 11, 2011, Dr. Chan prepared a narrative to Plaintiff's attorney in which he noted Plaintiff was hospitalized because of worsening of his depression in June 2010.  At that time, Plaintiff also experienced anxiety and hallucinations.  He continued his outpatient treatment and was seen once every 4 weeks, meeting recently once every 8 to 10 weeks.  He has improved, but continues to experience residual depressive symptoms and anxiety.  At the time of this report, Dr. Chan was prescribing Geodon for hallucinations, Celexa for depression, and Ativan for anxiety.  Dr. Chan concluded that Plaintiff "will continue to have difficulty with his depression and anxiety in the next 12 months.  He is not able to do full-time, competitive work."  (*PageID#* 628).

11

4.     **George Schulz, Ph.D.**

Dr. Schulz interviewed and evaluated Plaintiff on August 24, 2010, on behalf of

the Ohio BDD.  (*PageID##* 547-52).  Plaintiff reported to Dr. Schulz that he experienced

a depressed mood for most of the day for the past two or more years that resulted in low

energy, overeating, low self-esteem, poor concentration, and feelings of hopelessness.

He reported a typical day consists of yard work, mechanical repairs, and reading.  On a

regular basis he is raising his children, washing dishes, cleaning the house, and shopping.

His wife does the laundry.  (*PageID#* 549).  Dr. Schulz observed that Plaintiff's mood

was euthymic, his affect was appropriate and congruent, and he had no physiological

correlate related to affect and mood, such as saddened facial musculature, psychomotor

retardation, or motoric or autonomic signs of anxiety.  (*PageID#* 551).  He diagnosed

Plaintiff with dysthymia and assigned a GAF score of 55.  (*PageID#* 550).  Dr. Schulz

opined that Plaintiff had no impairment in his ability to relate to others; mild impairment

in his ability to understand, remember, and follow instructions; mild impairment in his

ability to maintain concentration, persistence, and pace; and mild impairment in his

ability to withstand the stress and pressures associated with day-to-day work activity.

(*PageID##* 551-52).

5.     **State Agency Evaluations**

After review of Plaintiff's medical record on August 30, 2010, Kristin Haskins,

Psy.D. assessed his mental condition at the request of the Ohio BDD.  Dr. Haskins found

Plaintiff had a mild restriction in his daily activities; mild difficulties in maintaining

12

social functioning and in maintaining concentration, persistence or pace; and no episodes of decompensation.  (*PageID#* 110).  Dr. Haskins further determined that the evidence did not establish the presence of the "C" criteria.  (*Id.*).  Dr. Haskins determined that Plaintiff did not have a severe mental impairment because he is able to care for his personal needs, has an active social life, cares for household chores, and is able to understand and complete multi-step tasks.  His emotional condition does not cause severe limitations in his work related abilities.  (*Id.*).

On November 30, 2010, Paul Tangeman, Ph.D., reviewed Plaintiff's record upon reconsideration and also concluded that he did not have a severe mental impairment.  (*PageID##* 128-29).  Dr. Tangeman found Plaintiff partially credible, noting he describes somewhat more severe limitations than would be expected based on the objective findings in the file.  (*PageID#* 130).

## III.   <u>Administrative Review</u>

### A.   <u>"Disability" Defined</u>

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the

13

regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.     ALJ Lombardo's Decision

ALJ Lombardo resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations. *See PageID## 58-59; see also* 20 C.F.R. § 404.1520(a)(4). Her pertinent findings began at Step 2 of the sequential evaluation where she concluded that Plaintiff had the following severe impairments: residual effects of knee surgery and obesity. (*PageID#* 59). ALJ Lombardo determined that Plaintiff has "non-severe" impairments of dysthymia or other mental impairment, carpal tunnel syndrome, heart condition, and remote cerebrovascular accident. (*PageID##* 60-61).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments. (*PageID#* 65).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional

capacity ("RFC")[6] to perform the full range of light exertional work.[7] (*PageID#* 64). The

ALJ further found that Plaintiff is capable of performing his past relevant work as a

shipping clerk. (*PageID#* 67).

The ALJ's findings throughout her sequential evaluation led her to ultimately

conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or

SSI. (*PageID##* 67-68).

## IV.   **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.

2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains

evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th

Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence

---

[6]The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. § 404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

[7]The Regulations define light work as involving the ability to lift " no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. § 404.1567(b).

standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.  Discussion

### A.  Physical Impairments and RFC

Plaintiff maintains that the ALJ erred in failing to provide the requisite narrative discussion with respect to his physical RFC assessment, as required by Social Security Rule 96-8p.  Specifically, Plaintiff asserts the ALJ failed to conduct the required function by function analysis of Plaintiff's ability to sit and stand/walk because every source that

examined or treated Plaintiff opined he had a significant limitation in the duration he could sit and stand/walk.  (Doc. #7 at *PageID#* 722).

Social Security Ruling 96-8p requires the ALJ's RFC assessment to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p further provides:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

(*Id.*).

The ALJ is also required to include "a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."  (*Id.*).

Here, the ALJ based her physical RFC determination on the "recommendation of Dr. Caldwell and in part Dr. Kennington."  (*PageID#* 65).  Dr. Kennington's sit/stand option limitation was rejected because the ALJ concluded there were no relevant examination findings to support it.  (*PageID#* 60).  Similarly, the ALJ rejected Dr. McFann's physical limitations finding "the medical evidence of record does not support them."  (*PageID#* 61).

17

Plaintiff's severe impairments of residual effects of knee surgery and obesity do not translate automatically into clearly definable exertional restrictions, much less denote an ability to perform a range of light work activity. Significantly, the ALJ's decision fails to include a narrative explanation describing how the medical evidence of record supports the specific exertional limitations set forth in the ALJ's RFC finding. *See* SSR 96–8p. Although the ALJ did discuss plaintiff's statements of limitations, as well as the medical evidence related to Plaintiff's knee impairment and treatment (*PageID##* 59-61), the ALJ failed to take the next step and explain how such evidence signified an ability to perform light work. Simply listing the medical and other evidence contained in the record and setting forth an RFC conclusion without linking such evidence to the functional limitations ultimately imposed in the RFC is insufficient to meet the "narrative discussion" requirement of SSR 96-8.

The ALJ's decision reflects that she considered Plaintiff's statements regarding his symptoms and alleged limitations in assessing Plaintiff's RFC, however, the ALJ's decision in this respect lacks any explanation that would allow this Court to determine the weight the ALJ actually gave to Plaintiff's statements in determining his RFC. The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment."

18

(*PageID##* 64-65).  The Court simply is unable to identify to what extent Plaintiff's "credible" statements were accepted or rejected by the ALJ in devising the RFC decision.

**B.     Mental Impairments and RFC**

  **1.     Severe Impairments and Step 2 of the Sequential Analysis**

  Plaintiff alleges that "ALJ Lombardo failed to include any mental health limitation in her residual functional capacity determination without the support of substantial evidence causing the decision to be incapable of meaningful review.  First, it was error for the ALJ to not find any severe mental health impairment."  (Doc. #7 at *PageID#* 714).

  An impairment is not considered severe if it "does not significantly limit [one's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) "[u]nderstanding, carrying out, and remembering simple instructions"; (4) "[u]se of judgment"; (5) "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and (6) "[d]ealing with change in a routine work setting."  20 C.F.R. § 404.1521(a)(b).  Step two "has been described as 'a de minimis hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).  "The goal of the test is to 'screen out totally groundless claims.'"

19

*Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008) (quoting *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir. 1985)).

Generally, an ALJ does not commit error requiring automatic reversal of the Commissioner's decision and an immediate award of benefits when the ALJ finds a non-severe impairment and determines that a claimant has at least one other severe impairment and then goes on with the remaining steps in the disability evaluation.  *See Maziarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987). That is because the ALJ considers all impairments, including non-severe impairments, in determining residual functional capacity to perform work activities.  (*Id.*).

A more comprehensive reading of Plaintiff's medical records reflects that Plaintiff's primary care physician, Dr. McFann, prescribed medication for Plaintiff's anxiety symptoms.  (*PageID##* 423, 428).  In January 2011, Dr. McFann reported Plaintiff suffered from an anxiety disorder.  (*PageID#* 571).  Dr. McFann also found that Plaintiff's emotional difficulties contributed to his overall functional limitations.  As a result of his depression, anxiety, and avoidance, Dr. McFann opined that Plaintiff was incapable of performing even low stress work.  (*PageID#* 576).  Plaintiff was hospitalized in June 2010, with major depressive disorder, severe, with psychotic features; schizoaffective disorder, depressive type.  (*PageID#* 633).  Following his hospitalization, Plaintiff began treatment with a counselor, Mr. Schweikert, who completed a questionnaire in November 2010, in which he noted that Plaintiff suffers from major depression and experiences low energy, poor concentration, crying spells, and feeling

20

overwhelmed. (*PageID##* 568-69). Plaintiff began treating with psychiatrist, Dr. Chan in June 2010. (*PageID##* 632-33). In July 2011, Dr. Chan opined that Plaintiff was markedly limited in understanding and memory, sustained concentration and persistence, social interactions, and adaptation. (*PageID##* 622-24). Dr. Chan also opined that Plaintiff was incapable of even low stress work because he was easily distressed, had poor concentration, and increased anxiety due to his mental impairments. (*PageID#* 625). In November 2011, Dr. Chan noted that even though Plaintiff has improved, he continues to experience residual depressive symptoms and anxiety. Dr. Chan concluded that Plaintiff "will continue to have difficulty with his depression and anxiety in the next 12 months. He is not able to do full-time, competitive work." (*PageID#* 628).

The ALJ observed that Plaintiff's mental health symptoms "are subject to alleviation with psychotropic medication and mental health counseling." (*PageID#* 66). ALJ Lombardo found Plaintiff had no severe mental health limitations based on the opinions of the consultative examiner, Dr. Schulz, and non-examining reviewers, Drs. Haskins and Tangeman. (*PageID##* 62-63). The medical records, which are summarized above, plainly undermine this determination.

Because the sequential analysis stopped at step 2 as to Plaintiff's mental impairments, there has been no resolution in this case as to the degree to which the Plaintiff's severe impairments affect his RFC or his ability to perform work. These factual determinations must be made by the ALJ in the first instance. The ALJ failed to recognize the presence of a severe mental impairment although she continued on through

the sequential evaluation process to step 4, before concluding that Plaintiff is not disabled.

As the ALJ did not describe any non-exertional limitations nor properly consider Plaintiff's mental health limitations in the RFC, it cannot be concluded that this matter falls within the parameters of *Maziarz*.  Accordingly, for the reasons stated above, the ALJ's decision is not supported by substantial evidence and must be reversed.

### 2.  Weight assigned to non-medical source, Mark Schweikert, PCC-S

Plaintiff also contends "ALJ Lombardo neglected to comment on or consider the opinion from [Plaintiff]'s treating therapist Mr. Schweikert, causing the decision to be incapable of meaningful review and unsupported by substantial evidence."  (Doc. #7 at *PageID#* 716).

Under the regulations, as a therapist, Mr. Schweikert is not an "acceptable medical source" as defined by 20 C.F.R. § 404.1513(a)(1)-(5).  While SSR 06-03p, 2006 SSR LEXIS 5, recognizes that "non-medical sources" who had contact with a claimant in their professional capacity are valuable sources of evidence for assessing impairment severity and functioning, the regulation also allows the ALJ to give greater weight to "acceptable medical sources" who are recognized as more-qualified healthcare professionals.  (*Id.*).

Moreover, under SSR 06-03p, 2006 SSR LEXIS 5, the opinions of "non-medical sources," like those of "acceptable medical sources" must be weighed and evaluated with the criteria set forth in 20 CFR § 404.1527, as further amplified in Social Security Rulings 96-2p, 1996 SSR LEXIS 9 and 96-5p, 1996 SSR LEXIS 2.  The factors the ALJ

must consider include the consistency of the opinion with the other evidence of record, and the degree to which the source presents relevant evidence to support that opinion. *See* 20 C.F.R. § 404.1527.

Although Mr. Schweikert is not an "acceptable medical source" within the meaning of the Regulations (20 C.F.R. § 404.1512; 20 C.F.R. § 404.1527(a)(2)) and cannot be afforded controlling weight (20 C.F.R. § 404.1527(d)(2)), his medical opinions still must be considered and weighed as a medical source within the framework of the treating physician rule, with the exception of the controlling weight provision. *See Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011)) (ALJ erred by failing to apply the substance of the treating physician rule to a treating social worker who is not an acceptable medical source). The Regulations dictate that opinions from non-acceptable medical sources – such as evidence from a therapist – should be considered in determining "the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to do work." 20 C.F.R. § 404.1513(d). SSR 06-03p dictates that opinions from "other sources" may be used to show the severity of an individual's impairments, and how it affects their ability to function. The Ruling states that the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6) must be applied to evidence from these "other" medical sources. *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (ALJ must consider SSR 06-03p when weighing the opinions of a nurse practitioner).

The ALJ's decision neither considers nor mentions the supportability or consistency of the opinion provided by Mr. Schweikert and does not refer to any other regulatory factor as a ground for rejecting his opinions.

### 3. Weight to Dr. Chan's treating psychiatrist's opinion

Plaintiff argues that "ALJ Lombardo violated one of the core components of Social Security disability determination, the treating physician rule, by failing to provide any good reason for assigning less than controlling weight to Dr. Chan's treating psychiatrist's opinion." (Doc. #7 at *PageID#* 719).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 530-31 (6th Cir. 1997); *see also Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory

diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Cole,* 661 F.3d at 937.  If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion.  *See Gayheart,* 710 F.3d at 376; *Wilson,* 378 F.3d at 544.  These factors include the length, nature and extent of the treatment relationship and the frequency of examination.  20 C.F.R. § 404.1527(c)(2)(i)(ii); *Wilson,* 378 F.3d at 544.  In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6); *Gayheart,* 710 F.3d at 376; *Wilson ,* 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'"  *Cole,* 661 F.3d at 937 (citation omitted); *see also Wilson,* 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion).  Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole,* 661 F.3d at 937 (citing SSR 96-2p).

In the present case, the ALJ gave "little weight" to Dr. Chan's opinion that Plaintiff is not able to do full-time, competitive work based on his mental impairment. (*PageID#* 63).  The ALJ also concluded that Plaintiff's activities of daily living were inconsistent with the limitations opined by Dr. Chan.  (*Id.*).

Plaintiff's treatment records, summarized above, document numerous instances consistent with Dr. Chan's opinion.  Following his psychiatric hospitalization in June 2010, Plaintiff began treating with Dr. Chan for medication management.  Dr. Chan observed that Plaintiff exhibited constricted affect, depressed mood, and limited insight and judgment.  (*PageID##* 647-59).  He opined that Plaintiff's medications had stabilized his conditions and he was improving but continued to have severely limiting effects from his impairments.  (*PageID##* 619-26, 628, 647).  In addition, Dr. Chan's opinion is consistent with both Dr. McFann's and Mr. Schweikert's opinions.  (*PageID##* 568-69, 576-77, 628).

Even assuming the ALJ's rejection of Dr. Chan's opinion was somehow proper, the ALJ nonetheless also erred by failing to properly weigh the opinions of Drs. Schulz, Haskins, and Tangeman.

After rejecting Dr. Chan's opinions, as noted above, the ALJ based her assessment that Plaintiff's mental impairment was non-severe on the opinions of consultative psychologist, Dr. Schulz, and the opinions of state agency psychologists, Drs. Haskins and Tangeman.  The ALJ explained:

26

> Drs. [Schulz] Haskins and Tangeman all found no severe mental impairment with only either no or mild limitation in the four work related functional categories.  All of these opinions were given after his hospitalization in June 2010.  There have been no subsequent hospitalizations.

(*PageID#* 63).

The ALJ gave the State agency medical consultants' assessments "significant weight, as they are consistent with the overall evidence of record with regard to mental impairment."  (*PageID#* 63).  Yet the ALJ was not permitted to automatically accept the opinions of the non-examining State agency reviewers.  Instead, the Regulations carefully delineate other factors pertinent to the ALJ's evaluation, reiterating three times the requirement that those factors apply to the evaluation of non-treating medical sources.  *See* 20 C.F.R. § 404.1527(d) ("we consider all of the following factors in deciding the weight to give any medical opinion . . ."); *see also* 20 C.F.R. § 404.1527(f)(ii) (factors apply to opinions of state agency consultants or other program physicians); 20 C.F.R. § 404.1527(f)(iii) (same as to medical experts' opinions); Social Sec. Ruling 96-6p, 1996 WL 374180 at *2 (same).  The ALJ's decision provides no such analysis.  Instead, the ALJ appears to provide these opinions "significant weight" because their opinions are consistent with "the overall evidence of record" and Plaintiff's daily activities.  (*PageID#* 63).  The ALJ, however, did not indicate what "other objective medical evidence" in the record is consistent with these opinions.  Such a failure also requires this case be remanded.  *See Gayheart*, 710 F.3d at 379 ("[The ALJ's] failure to

apply the same level of scrutiny to the opinions of the consultative doctors on which he

relied, let alone the greater scrutiny of such sources called for by 20 C.F.R. §

404.1527, further demonstrates that his assessment of [the treating physician's] opinions

failed to abide by the Commissioner's regulations and therefore calls into question the

ALJ's analysis.")(internal citation omitted).

Accordingly, Plaintiff's challenges to the ALJ's evaluation of the medical source

opinions of record are well taken.

## VI.  <u>Remand is Warranted</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are

not supported by substantial evidence, the Court must decide whether to remand the case

for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42

U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's

decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*,

501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous

principle of law, failed to consider certain evidence, failed to consider the combined

effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of*

*Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the

evidence of disability is not overwhelming, and because the evidence of a disability is not

strong while contrary evidence is weak.  *See id.*  However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to the problems discussed *supra*.

On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulation and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-Step sequential analysis to determine anew whether Plaintiff was under a disability and whether his applications for DIB and SSI should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff Stephen R. Duderstadt was under a "disability" within the meaning of the Social Security Act;

3.    This matter be **REMANDED** to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.    The case be **TERMINATED** on the docket of this Court.

July 15, 2014

            _____s/Sharon L. Ovington_____
              Sharon L. Ovington
         Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474  U.S. 140 (1985);  *United States v. Walters*, 638 F. 2d 947, 949-50 (6th Cir. 1981).